UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOE BALTAS,                                   :
                  Plaintiff,                  :
                                              :
        v.                                    :        CASE NO. 3:19-cv-1043 (MPS)
                                              :
HECTOR RIVERA, et al.,                        :
                  Defendants.                 :
_____

**RULING ON MOTIONS FOR SUMMARY JUDGMENT**

The plaintiff, Joe Baltas, commenced this civil rights action *pro se* asserting claims

relating to his confinement from November 2018 until January 2019.  The remaining claims are

denial of due process, use of excessive force, deliberate indifference to medical needs, and

retaliation. The remaining defendants, Lieutenant Hector Rivera, Lieutenant Sonja Harris,

Captain Ernestine Green, and Warden Allison Black, have filed a motion for summary judgment

on the grounds that (1) the plaintiff failed to properly exhaust his administrative remedies on any

claim for relief, (2) there is no evidence to support the plaintiff's claims for violation of his

constitutional rights, and (3) the defendants are protected by qualified immunity.  The plaintiff

has filed both an opposition brief and his own motion for summary judgment.  For the following

reasons, the defendants' motion for summary judgment is granted in part and denied in part, and

the plaintiff's motion is denied.

I.      Standard of Review

        A motion for summary judgment may be granted only where there is no genuine dispute

as to any material fact and the moving party is entitled to judgment as a matter of law.  Rule

56(a), Fed. R. Civ. P.; *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.,* 875 F.3d 107,

113-14 (2d Cir. 2017). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage*, 875 F.3d at 113-14 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Which facts are material is determined by the substantive law. *Anderson*, 477 U.S. at 248. "The same standard applies whether summary judgment is granted on the merits or on an affirmative defense …." *Giordano v. Market Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010).

The moving party bears the initial burden of informing the court of the basis for its motion and identifying the admissible evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). He cannot "rely on conclusory allegations or unsubstantiated speculation but must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 34 (2d Cir. 2015) (citation and internal quotation marks omitted). To defeat a motion for summary judgment, the nonmoving party must present such evidence as would allow a reasonable jury to find in his favor. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000). In deciding a motion for summary judgment, the Court must construe the record in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Martinez v. Connecticut Dep't of Corrections*, 125 F. Supp.3d 397, 406 (D. Conn. 2015).

Although the court is required to read a self-represented "party's papers liberally and interpret them to raise the strongest arguments that they suggest," *Willey v. Kirkpatrick*, 801 F.3d

51, 62 (2d Cir. 2015), "unsupported allegations do not create a material issue of fact" and do not overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

II.      Facts[1]

The plaintiff, who is in the custody of the Connecticut Department of Correction, is currently housed in a Virginia state prison under an interstate agreement between Connecticut and Virginia. Defs.' Local Rule 56(a)1 Statement, ECF No. 45-2, ¶ 1. The parties dispute the length of the plaintiff's sentence but agree his projected release date is in the next century. *Id.* ¶ 2 & Pl.'s Local Rule 56(a)2 Statement, ECF No. 53-2, ¶ 2. The plaintiff has a lengthy disciplinary history spanning the length of his incarceration, which began in 2006. ECF No. 45-2 ¶ 3.

In 2014, the plaintiff was placed on High Security status, a designation providing increased supervision of inmates posing a threat to the safety and security of the correctional facility, correctional staff, other inmates, or the public. *Id.* ¶ 4. The plaintiff remains on this status today. *Id.* This placement followed the discovery of two journals in the plaintiff's cell containing the names of correctional officials, jurors, and gang leaders, and instructions for making a bomb with materials available in prison.[2] *Id.* ¶ 5.

---

[1] The facts are taken from the parties' Local Rule 56(a) Statements and exhibits. The Court relies primarily on the Local 56(a) Statements filed in support of and in opposition to the defendants' motion for summary judgment. The recitation is supplemented by facts from the Rule 56(a) Statements filed in support of and in opposition to the plaintiff's motion for summary where these statements add facts not already recounted.

[2] Although the plaintiff denied possession of the names of gang leaders or bomb-making instructions, his denial is not supported by a citation to admissible evidence. ECF No. 53-2 ¶ 5. Absent a citation to admissible evidence, the defendants' statement is deemed admitted. Local Rule 56(a)2 requires the party opposing summary judgment to submit a Local Rule 56(a)2 Statement that contains separately numbered paragraphs corresponding to the Local Rule 56(a)1 Statement and indicates whether the opposing party admits or denies the facts set forth by the moving party. Each admission or denial must include a citation to an affidavit or other admissible evidence. D. Conn. L. Civ. R. 56(a)2 and 56(a)3. Absent the required citation in the Local Rule 56(a)2 Statement, the statement

On April 20, 2018, the plaintiff was also designated to Chronic Discipline status. *Id.* ¶ 6. Chronic Discipline status, which is based on the frequency and seriousness of disciplinary violations, is utilized when an inmate receives multiple disciplinary charges in a short period of time. *Id.* ¶ 7. The plaintiff was so designated because he received five disciplinary reports in 120 days for charges including public indecency, threats, security tampering, and interfering with safety and security. *Id.* ¶ 8. The Chronic Discipline program has two phases and various requirements that must be satisfied for an inmate to progress through the program and be removed from Chronic Discipline status. *Id.* ¶ 10. While on Chronic Discipline status, prior to the incidents underlying this action, the plaintiff received disciplinary reports for public indecency, interfering with safety and security, disobeying a direct order, and false reporting. *Id.* ¶ 12. These disciplinary reports would have delayed the plaintiff's progression through the Chronic Discipline program. *Id.* ¶ 13.

The parties dispute whether the plaintiff remained on Chronic Discipline status on November 8, 2018. *Id.* ¶ 14 & ECF No. 53-2 ¶ 14. On that date, he was transferred to Massachusetts under an interstate corrections agreement. *Id.* ¶ 15. Although he was incarcerated in a Massachusetts correctional facility, the plaintiff remained in the custody of the Connecticut Department of Correction; he had not been released from Connecticut custody.[3] *Id.* ¶ 16.

---

in the Local Rule 56(a)1 Statement is deemed admitted. *See* D. Conn. L. Civ. R. 56(a)1 ("All material facts set forth in [the Local Rule 56(a)1] statement and supported by the evidence will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party in accordance with Rule 56(a)2.").

[3] Although the plaintiff objects to the statement that he remained in the custody of the Connecticut Department of Correction, the evidence he cites refers to a CUSCOM transfer, *i.e.*, a transfer under an interstate corrections compact. *See* Pl.'s Ex. 3, ECF No. 53-3 at 12 & Defs.' Ex. T, ECF No. 45-18. *See also Robinson v. Atkinson*, No. 03 Civ. 5176 DAB DF, 2004 WL 1798129, at *4 (S.D.N.Y. Aug. 5, 2004) ("In the context of interstate transfers, the sending state remains the custodian of the petitioner, while the receiving state merely acts as an agent for the sending state.").

During the period relevant to this action, defendant Rivera was the Administrative Intelligence Lieutenant at HCC, defendant Black was the Warden, defendant Green was an Administrative Captain and defendant Harris was a Lieutenant.  *Id.* ¶ 17.  Defendant Rivera's duties included managing restrictive housing at Hartford Correctional Center ("HCC") which comprised the restrictive housing cells in South Block and the Restrictive Housing Unit ("RHU").  *Id.* ¶ 18.

In November 2018, HCC was notified by the Interstate Management Unit ("IMU") that the plaintiff would be returning to Connecticut for a court appearance and would be housed at HCC during his stay.  *Id.* ¶ 19.  The plaintiff was scheduled to return to Connecticut on November 30, 2018.  *Id.* ¶ 20.  IMU recommended that the plaintiff be housed in Administrative Detention while he was in Connecticut.  *Id.* ¶ 21.

Defendant Rivera reviewed the plaintiff's records and noted that he had active High Security and Chronic Discipline designations.  *Id.* ¶ 22.  Although the plaintiff denies an active Chronic Discipline designation, the evidence he points to does not support this denial.  Specifically, he submits an email chain noting that although there was "[n]ot much info in the file and nothing noted on class log," the most recent entry regarding Chronic Discipline status in another part of his DOC record showed that he was in Phase 2 of the Chronic Discipline program.  Pl.'s Opp'n Ex. 6, ECF No. 53-3 at 21.  Defendant Rivera also became aware of the plaintiff's disciplinary history and the reasons for these designations.  ECF. No. 45-2 ¶ 23.  Defendant Rivera confirmed the active Chronic Discipline designations through Department of Correction records and by consulting administrative staff.  *Id.* ¶ 25.

Restrictive housing status is a designation permitting "closely regulated management and

separation" of inmates. *Id.* ¶ 27. The RHU is a physically separate unit housing inmates on restrictive housing status, Administrative Detention, or Transfer Detention. *Id.* ¶ 28. In addition to the RHU, inmates on restrictive housing status at HCC may be housed in South Block. *Id.* ¶ 29. RHU and South Block are in the same area of the prison with South Block less remote than RHU. *Id.* ¶ 31.

Based on the plaintiff's Chronic Discipline designation, which warranted RHU placement, safety concerns related to his High Security Designation, and the IMU recommendation that he be housed in Administrative Detention, correctional officials decided that the plaintiff should be housed in RHU or South Block while at HCC. *Id.* ¶ 30. Defendant Rivera considered several factors, including the plaintiff's disciplinary history and the inmate population housed in each area, when deciding whether to assign the plaintiff a cell in South Block or RHU. *Id.* ¶ 32.

Defendant Rivera found the plaintiff's history of public indecency especially troubling as there was more traffic in South Block, including female employees. *Id.* ¶ 33. Defendant Rivera assigned the plaintiff to be housed alone in cell 12 in South Block. *Id.* ¶ 34. His Chronic Discipline designation subjected the plaintiff to the following conditions: one hour of recreation per day, five days per week; limited spending in the commissary; a radio with restrictions; no television access; mail privileges as in general population; two thirty-minute non-contact visits per week with approved immediate family members and special attorney visits; at least three showers per week; one meal per day out of his cell; daily security checks; at least one cell search per week; unrestrained out-of-cell movement; and participation in approved facility programs separate from general population. *Id.* ¶ 36. The conditions in Administrative Detention were the

same as those listed above with the exceptions that the inmate could not have a radio, was required to eat all meals in his cell, was subjected to at least three cell searches per week, and could not participate in facility programs.  *Id.* ¶ 38.

On November 30, 2018, defendant Rivera met with the plaintiff upon his arrival at HCC and told the plaintiff he would be housed in South Block under the Chronic Discipline conditions.  *Id.* ¶ 39.  The plaintiff protested, claiming that he did not believe he still was designated Chronic Discipline.  *Id.* ¶ 40.  Following this conversation, defendant Rivera sent an email message to several correctional officials, including defendants Black and Green, regarding his conversation with the plaintiff.  Pl.'s Local Rule 56(a)1 Statement, ECF No. 50-2, ¶ 10.

On December 3, 2018, the plaintiff was involved in an altercation with another inmate and allegedly threw a liquid at the inmate.  ECF No. 45-2 ¶ 41.  The plaintiff was issued a disciplinary report for assault and received notice of the charge the following day.  *Id.* ¶ 42.  Following the altercation, defendant Rivera determined that the plaintiff's continued presence in South Block posed a risk and moved him from cell 12 in South Block to cell 4 in RHU.  *Id.* ¶ 43.  The same day, the plaintiff received disciplinary reports for interfering with safety and security and threats; he received notice of these charges on December 4, 2018.  *Id.* ¶ 44.  The plaintiff received a fourth disciplinary report for public indecency on December 6, 2018, while he was confined in RHU cell 4.  *Id.* ¶ 45.  He received notice of the charge on December 7, 2018.  *Id.* The plaintiff objects to the defendants' references to these charges, arguing that the charges were dismissed without findings of fact.  ECF No. 53-2 ¶¶ 41, 44-45.  However, he does not dispute that the disciplinary reports were issued and pending on December 7, 2018.

On December 7, 2018, the admitting and processing unit instructed RHU to move the

plaintiff from cell 4 to cell 11.  ECF No. 45-2 ¶ 46.  At 11:40 a.m., defendant Rivera went to

RHU after a unit officer told him that the plaintiff refused to move to cell 11.  *Id.* ¶ 47.  Officer

Rivera told the plaintiff that he was moving to cell 11 and that he needed to put his hands

through the trap to be handcuffed for the move to the new cell.  *Id.* ¶ 48.  The plaintiff refused to

change cells and refused to comply with the order to be handcuffed.  *Id.* ¶ 49.  The plaintiff avers

that he said he would comply if a captain or the warden was present.  ECF No. 53-2 ¶ 49.

Defendant Rivera thought that force might be necessary and ordered a video camera to be

brought to the cell and that additional staff report to RHU.  *Id.* ¶ 50.  With the additional staff

present, the plaintiff said that he was ready to comply with the order and move to the new cell.

*Id.* ¶ 51.  Defendant Rivera looked into the cell to check that the plaintiff had nothing in his

hands, then ordered the plaintiff to turn around and put his hands through the trap.  *Id.* ¶ 52.  The

plaintiff acted as if he were complying with the order.  *Id.*  Defendant Rivera ordered an officer

to open the trap.  *Id.* ¶ 53.  When the trap opened, the plaintiff leaned down, picked up a cup of

unknown liquid that was hidden near the door, and threw the contents of the cup at defendant

Rivera.  *Id.* ¶ 54.  The liquid got on defendant Rivera's hands and uniform before officers were

able to close the trap.  *Id.* ¶ 55.  The plaintiff then put his mattress against the cell door

obstructing the window.[4]  *Id.* ¶ 56.

---

[4] The plaintiff states, for the first time, in his Local Rule 56(a)1 Statement that defendant Rivera sprayed
him with a chemical agent through the crack in the cell door.  Pl.'s Local Rule 56(a)1 Statement, ECF No. 50-2 ¶ 21.
This claim is not mentioned in Plaintiff's complaint, *see* ECF No. 1 at ¶¶ 45-46 (first mention of use of chemical
agent is after plaintiff pushed mattress against door), and a response to summary judgment is not a proper means of
amending a complaint.  *Shah v. Helen Hayes Hosp.*, 252 Fed appx. 364 *2 (2d Cir. Oct. 29, 2007)("A party may not
use his or her opposition to a dispositive motion as a means to amend the complaint.").  The defendants deny the
allegation as unsupported by the video footage and object to the inclusion of a new instance of use of force on
summary judgment.  Defs.' Local Rule 56(a)2 Statement, ECF No. 50-2, ¶ 21.  The video footage shows defendant
Rivera's hand briefly near the crack of the door but does not clearly show whether or not he deployed a chemical
agent.  *See* Defs.' Mem. Ex. K at 4:05.

Defendant Rivera ordered an officer to begin recording the incident.  *Id.* ¶ 57.   Defendant Rivera then gave the plaintiff multiple commands to remove the mattress and comply with the handcuff order.  *Id.* ¶ 58.  The plaintiff refused to comply with the order, stating that he would comply only if a captain or warden was present.  *Id.*; ECF No. 53-2 ¶ 58.  The plaintiff stated several times that he was afraid of defendant Rivera and feared for his safety.  ECF No. 50-2 ¶ 23.

Defendant Rivera called medical to the housing unit.  ECF No. 45-2 ¶ 59.  Defendant Lieutenant Harris went to RHU when she heard about the incident.  *Id.* ¶¶ 60-61.  At defendant Rivera's request, she spoke to the plaintiff but did not gain his compliance with the orders.  *Id.* ¶ 62.  Defendant Rivera also asked Correctional Head Nurse ("CHN") Tralli and Counselor Grandpre to speak to the plaintiff.  *Id.* ¶ 63.  Their attempts at verbal intervention were unsuccessful.  *Id.*  Defendant Rivera then gave the plaintiff several more orders to remove the obstruction and comply with the orders and warned him that physical force, including deployment of a chemical agent, would be used if he did not comply.  *Id.* ¶ 64.

The plaintiff stated several times that he had contraindications for use of a chemical agent.  ECF No. 50-2 ¶ 24.  Defendant Rivera asked CHN Tralli to confirm that there were no contraindications to use of a chemical agent in the plaintiff's medical records and CHN Tralli said there were none.  ECF No. 45-2 ¶ 65.[5]  Defendant Rivera determined that use of force, including use of a chemical agent, would be required to gain the plaintiff's compliance.  *Id.* ¶¶ 66-67.  The plaintiff continued to refuse to comply unless a warden or captain was present.  ECF

---

[5] The plaintiff cites, among other things, a medical incident report, dated February 5, 2018, in which he is quoted as saying "I have asthma real bad," ECF No. 50-3 at 58; but he does not dispute, or submit any evidence to rebut, that CHN Tralli told Defendant Rivera that there were no contraindications to use of a chemical agent.

No. 53-2 ¶ 66.  Protocol required that the plaintiff comply with lawful commands given by the RHU supervisor.  ECF No. 45-2 ¶ 69.

After giving the plaintiff time to comply with the final warning and absent such compliance, defendant Rivera instructed one officer to cover the trap with a ballistic shield while another officer opened the trap.  *Id.* ¶ 70.  Defendant Rivera also obtained a Barricade Obstruction Tool ("BOT"), which is designed to safely move or remove a cell door obstruction from outside the cell and assist in the effective deployment of a chemical agent into the cell.  *Id.* ¶ 71.  Defendant Rivera used the BOT to try to move the mattress the plaintiff was pressing against the cell door.  *Id.* ¶ 72.  The plaintiff denies that he was pushing the mattress against the door, ECF No. 53-2 ¶ 72, but the video footage shows the mattress obscuring the cell door window.  After moving the mattress, defendant Rivera deployed one burst of the chemical agent.  ECF 45-2 ¶ 73.  The BOT was removed and the trap secured.  *Id.*

Defendant Rivera again asked the plaintiff to comply with the orders but the plaintiff refused.  *Id.* ¶ 74.  Defendant Rivera warned the plaintiff that the chemical agent would be used again if he did not comply.  *Id.* ¶ 75.  When the plaintiff did not comply, defendant Rivera deployed a second burst of the chemical agent using the BOT.  *Id.* ¶ 76.  The plaintiff continued to refuse to comply with the orders.  *Id.* ¶ 77.  Defendant Rivera refused the plaintiff's request to call a supervisor.  ECF No. 53-2 ¶ 77.  Defendant Rivera deployed a third burst of the chemical agent, again using the BOT.  *Id.* ¶ 78.

Defendant Rivera ordered the plaintiff to comply with the orders to remove the obstruction and permit himself to be handcuffed and removed from the cell.  *Id.* ¶ 79.  On this occasion, the plaintiff complied with the orders.  *Id.* ¶ 80.  The plaintiff was secured and escorted

from the cell.  *Id.* ¶¶ 81-82.  Defendant Rivera believed that the plaintiff might spit at the officers and so ordered that a spit veil be applied.  *Id.* ¶ 83.  CHN Tralli observed no respiratory issues or indication that the plaintiff had been sprayed in his face with the chemical agent.  *Id.* ¶ 84. Plaintiff argues that CHN Tralli could not have viewed Plaintiff's face as he was masked by the spit veil, ECF No. 53-2 at 84, but the video makes clear both that the spit veil did not substantially obscure Plaintiff's face and that Plaintiff walked directly towards Tralli while he was being escorted to the shower.  Ex. L, 22:27-22:38.  Defendant Harris returned to her regular duties. ECF No. 45-2 ¶ 85.

The plaintiff was escorted to the shower and offered decontamination.  *Id.* ¶ 86.  The plaintiff refused stating, "I'm good."  *Id.*  The plaintiff argues that decontamination was impossible because he was clothed and wearing a spit veil.  ECF No. 53-2 ¶ 86.  He does not dispute, however, that he did not try to be decontaminated and did not ask that the spit veil be removed to facilitate decontamination.

The plaintiff was escorted to cell 9 where he was strip searched and dressed in clean clothes.  ECF No. 45-2 ¶ 87.  Defendant Rivera remained concerned that the plaintiff would again be disruptive and block his cell door and so ordered that the plaintiff be placed in in-cell restraints consisting of handcuffs and leg irons connected by a tether chain.  *Id.* ¶ 88.  Defendant Rivera instructed the officers to apply the restraints and ensured there was sufficient slack in the tether chain to permit the plaintiff to stand erect.  *Id.* ¶ 89.  The plaintiff states that the restraints were "tight and taut."  ECF No. 53-2 ¶ 89.  Review of the submitted video footage, however, shows the plaintiff standing erect and in no discomfort.  See Ex. L, 44:25-44:30.  CHN Tralli checked the restraints for proper circulation.  ECF No. 45-2 ¶ 90.  The spit veil was removed,

and the officers left the cell.  *Id.* ¶ 91.

Defendant Rivera had no further contact with the plaintiff relating to this incident.  *Id.* ¶ 92.  Later that day, the plaintiff received a disciplinary report for assault on staff.  *Id.* ¶ 93. Defendant Rivera was not involved with the subsequent restraint checks or the plaintiff's removal from in-cell restraints the following day.  *Id.* ¶ 94.

On December 7, 2018, defendant Harris worked on second shift supervising housing units that included RHU.  *Id.* ¶¶ 95-96.  Procedure requires that inmates in in-cell restraints be observed by custody staff every fifteen minutes and that they be reviewed regularly by medical staff.  *Id.* ¶ 99.  The review checklist indicates that, during the second shift, the plaintiff was observed yelling and screaming, crying, talking to himself, quiet, and lying or sitting down.  *Id.* ¶¶ 101-02.  The plaintiff denies yelling and screaming.  ECF No. 53-2 ¶ 101-02.

Defendant Harris participated in the 6:10 p.m. medical check.  ECF No. 45-2 ¶ 103.  At this time, medical staff described the plaintiff as "verbally aggressive," noted slight skin abrasions inside the wrist restraints, but found a finger breadth distance between the handcuff and skin.  *Id.*  The plaintiff denies that this check occurred.  ECF No. 53-2 ¶ 103.  Based on recent noted behavior and the plaintiff's behavior during the medical check, defendant Harris determined that the restraints should not be removed, but cites no evidence to support this denial. ECF No. 45-2 ¶ 104.  Shortly thereafter, defendant Harris was called to another unit and did not supervise the plaintiff during the remainder of the time he remained in in-cell restraints.  *Id.* ¶¶ 105-08.

Another medical check was performed on December 8, 2018 at 9:05 a.m.  *Id.* ¶ 109. Adequate range of motion and intact skin were noted.  *Id.*  Another lieutenant downgraded the

plaintiff off in-cell restraints later in the day.  *Id.* ¶ 110.  A medical check performed at that time noted no injuries.  *Id.*

After being removed from in-cell restraints, the plaintiff was moved to cell 11.  *Id.* ¶ 111. On December 12, 2018, the plaintiff received a disciplinary report for interfering with safety and security.  *Id.* ¶ 112.  The pending disciplinary charges were dropped to enable the plaintiff to be transferred back to Massachusetts on December 18, 2018.  *Id.* ¶ 113.

On January 3, 2019, the plaintiff returned to HCC for a court date.  *Id.* ¶ 114.  As correctional records indicated that the plaintiff remained on Chronic Discipline status and IMU recommended that he be placed on Administrative Detention during his temporary stay, the plaintiff was scheduled to be housed in RHU or South Block.  *Id.* ¶ 115.  The plaintiff disagrees that he remained on Chronic Discipline status.  ECF No. 53-2 ¶ 115.

Upon his arrival, the plaintiff was housed in RHU cell 13.  ECF No. 45-2 ¶ 116.  On January 16, 2019, the plaintiff was moved to RHU cell 8 so the door to cell 13 could be repaired. *Id.* ¶ 117.  On January 18, 2019, the plaintiff was moved to South Block cell 1.  *Id.* ¶ 118.  He returned to Massachusetts on January 22, 2019.  *Id.* ¶ 119.

All cells in RHU and South Block are heated, although the plaintiff denies that the cell was maintained at a comfortable temperature.  *Id.* ¶ 120; ECF No. 53-2 at ¶ 120.  During the period from November 2018 through January 2019, the heating system was operating normally with no issues reported.  *Id.* ¶ 121.  Inmates in RHU and South Block are provided bed linens. *Id.* ¶ 122.  The plaintiff was provided bed linens while housed there.  *Id.* ¶ 123.  The lights in some South Block cells can be controlled from within the cell.  *Id.* ¶ 124.  Other South Block cells and the RHU cells have lights that are centrally controlled.  *Id.*  These lights remain on from

8:00 a.m. to 11:00 p.m. and then are turned off for the rest of the evening.  *Id.*

Defendants Rivera and Black do not recall the plaintiff filing any grievance at HCC.  *Id.* ¶ 125.

III.    Discussion

The remaining claims in this case are for denial of due process against defendants Rivera, Black, and Green; retaliation against defendants Rivera and Black; use of excessive force against defendant Rivera and failure to intervene against defendant Harris; deliberate indifference to medical needs against defendants Rivera and Harris; and supervisory liability against defendants Black and Green regarding deliberate indifference to medical needs.  *See* Initial Review Order, ECF No. 10, & Ruling on Defendants' Motion to Dismiss, ECF No. 34.  The defendants move for summary judgment on three grounds, failure to properly exhaust administrative remedies, failure to establish the violation of constitutional rights, and qualified immunity.  The plaintiff argues that summary judgment should enter in his favor because the defendants violated his constitutional rights.

A.    Exhaustion of Administrative Remedies

The Prison Litigation Reform Act requires prisoners to exhaust administrative remedies before filing a federal lawsuit relating to prison conditions.  42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.").  This exhaustion requirement applies to all claims regarding "prison life, whether they involve general circumstances or particular episodes."  *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002).

14

Exhaustion of all available administrative remedies must occur regardless of whether the administrative procedures provide the relief that the inmate seeks.  *See Booth v. Churner*, 532 U.S. 731, 741 (2001).  Furthermore, prisoners must comply with all procedural rules regarding the grievance process prior to commencing an action in federal court.  *See Woodford v. Ngo*, 548 U.S. 81, 90-91, 93 (2006) (proper exhaustion "means using all steps that the agency holds out ... (so that the agency addresses the issues on the merits) ... [and] demands compliance with agency deadlines and other critical procedural rules").  Special circumstances will not relieve an inmate of his obligation to adhere to the exhaustion requirement.  An inmate's failure to exhaust administrative remedies is excusable only if the remedies are in fact unavailable.  *See Ross v. Blake*, ___ U.S. ___, 136 S. Ct. 1850, 1858 (2016).  A remedy is unavailable if, despite its description, the remedy "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates," the rules are so confusing that prisoners cannot navigate the process, or "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  *Id.* at 1858-59.

The Second Circuit has held that  a grievance "must allege facts sufficient to alert corrections officials to the nature of the claim, and provide enough information about the conduct at issue to allow prison officials to take appropriate responsive measures."  *Singh v. Lynch*, 460 F. App'x 45, 47 (2d Cir. 2012)(internal quotation marks omitted: noting that, although "[t]he burden is not heavy one" and "can be analogized to notice pleading", it was not satisfied with respect to the plaintiff's assault claim where the grievance only alleged other misconduct by the defendant and stated that there was additional misconduct that inmate feared describing).  Because the exhaustion requirement is intended to afford prison officials an

opportunity to address the issue internally, *Porte*r, 534 U.S. at 524-25, the inmate must include

sufficient information to enable prison officials to address the same claim asserted in federal

court.  *See Turner v. Goord*, 376 F. Supp. 2d 321, 324 (W.D.N.Y. 2005) ("[T]he mere fact that

plaintiff filed *some* grievance, and fully appealed all the decisions on that grievance, does not

automatically mean that he can now sue anyone who was in any way connected with events

giving rise to that grievance.").  The grievance need not, however, "lay out all the facts,

articulate legal theories, or demand particular relief.  All the grievance need do is object

intelligibly to some asserted shortcoming." *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir.

2004).

Exhaustion of administrative remedies is an affirmative defense.  Thus, the defendants

bear the burden of proof.  *See Jones v. Bock*, 549 U.S. 199, 16 (2007).  Once the defendants

establish that administrative remedies were not exhausted before the inmate commenced the

action, the plaintiff must establish that the administrative remedy procedures were not available

to him under *Ross*.  *See id.*

The administrative remedies for the State of Connecticut Department of Correction are

set forth in Administrative Directive 9.6.  *See* Defs' Mem. Ex. A, Administrative Directive 9.6,

Inmate Administrative Remedies (revised August 15, 2013).  Each request for administrative

remedy must be submitted on a separate form. *See id.* at 9.6(5)(E)(2).  The request and action

sought must be stated clearly and simply.  *See id.* at 9.6(5)(E)(3).

An inmate must first attempt to resolve the matter informally.  He may attempt to

verbally resolve the issue with an appropriate staff member or supervisor.  *See id.* at 9.6(6)(A).

If attempts to resolve the matter orally are not effective, the inmate must make a written attempt

using a specific form and send that form to the appropriate staff member. *See id.* If an inmate does not receive a response to the written request within fifteen business days or the inmate is not satisfied with the response to his request, an inmate may file a Level 1 grievance. *See id.* at 9.6(6)(C).

The Level 1 grievance must be filed within thirty calendar days from the date of the occurrence or discovery of the cause of the grievance and should include a copy of the response to the written request to resolve the matter informally or explain why the response is not attached. *See id.* The Unit Administrator shall respond in writing to the Level 1 grievance within thirty business days of his or her receipt of the grievance. *See id.* at 9.6(6)(I).

The inmate may appeal the disposition of the Level 1 grievance by the Unit Administrator or the Unit Administrator's failure to dispose of the grievance in a timely manner to Level 2. *See id.* at 9.6(6)(G), (I) & (K). The Level 2 appeal of a disposition of a Level 1 grievance must be filed within five calendar days from the inmate's receipt of the decision on the Level 1 grievance. *See id.* at 9.6(K). The Level 2 appeal of the Unit Administrator's failure to dispose of the Level 1 grievance in a timely manner must be filed within sixty-five days from the date the Level 1 grievance was filed by the inmate. *See id.* at 9.6(M).

Level 2 appeals of inmates confined in Connecticut correctional facilities are reviewed by the appropriate District Administrator. *See id.* at 9.6(6)(K). If an inmate is housed out of state, the level 2 appeal is decided by the Director of Sentence Calculation and Interstate Management. *See id.* at 9.6(6)(K)(2). The response is required within thirty business days of receipt of the appeal. *See id.* at 9.6(6)(K).

Level 3 appeals are restricted to challenges to department policy, the integrity of the

grievance procedure or level 2 appeals to which there has been an untimely response by the District Administrator.  *See id.* at 9.6(6)(L).  A Level 3 appeal must be filed within five calendar days from the inmate's receipt of the decision on the Level 2 appeal.  *See id.*  A Level 3 appeal of the District Administrator's failure to dispose of the Level 2 appeal in a timely manner must be filed within thirty-five days of the filing of the Level 2 appeal.  *See id.* at 9.6(6)(M).  A Level 3 appeal is reviewed by the Commissioner of Correction or his or her designee with a response provided within thirty business days of receipt of the Level 3 appeal.  *See id.* at 9.6(6)(L).

The plaintiff has submitted copies of six level 1 grievances he filed in December 2018 and January 2019.  The plaintiff filed three level 1 grievances dated December 6, 2018.  The first challenges the continuation of loss of phone sanctions.  Pl.'s Mem. Ex. 6, ECF No. 50-3 at 41-42.  The second challenges his continued classification on Chronic Discipline status.  *Id.* at 43-44.  The third challenges the policy of keeping cell lights on from 7:30 a.m. until 11:30 p.m.  *Id.* at 45-46.  On December 9, 2018, the plaintiff filed a fourth level 1 grievance relating to the events of December 7, 2018 and actions of defendants Rivera and Harris.  *Id.* Ex. 13, ECF No. 50-3 at 84-86.  The plaintiff filed the last two level 1 grievances on January 6, 2019.  The first challenges conditions of confinement at HCC "including but not limited to" the light being on 24/7, no phone, no visitation, no mail, no recreation, no hot water in the cell, exposure to cold, and no religious services.  *Id.* Ex. 16, ECF No. 50-3 at 89-90.  The second challenges his placement in RHU as an out of state prisoner.  *Id*. at 91-92.  The defendants acknowledge receipt of four of the grievances, those filed on December 6, 2018, and December 9, 2018.  Defs.' Mem. Ex. Q, ECF No. 45-15.

The parties disagree whether the plaintiff adequately asserted his claims in the

grievances, whether he appealed the lack of response to levels 2 and 3, and whether he was aware of the grievance procedure for out-of-state inmates.  The plaintiff also argues that administrative remedies were not available to him, claiming that the grievance process, for him, was a dead end.

I find that the undisputed evidence in the record shows that the plaintiff either exhausted his claims or that administrative remedies were not available – except as to his First Amendment retaliation claim.  *Shifflet v. Korszniak*, 934 F.3d 356, 366 (3d Cir. 2019)("Retaliation is a separate claim, and therefore must be separately grieved." (internal citation omitted)).  With regard to that claim, the only one of the six above-mentioned grievances that refers to "retaliation" or the First Amendment is the December 9 grievance relating to the cell extraction on December 7, 2018.  ECF No. 50-3 at 85-86.  But in that grievance, the brief mentions of "retaliation" and "1st … Amendment rights" are part of a catch-all litany of legal charges leveled by the plaintiff following his factual narrative.  (The plaintiff also described Rivera's order that he be moved to another cell as an act of "retaliation."  *Id.* at 85.)  The December 9 grievance does not mention the filing of grievances or other First Amendment-protected activity occurring at any time before the December 7 cell extraction; nor does it mention that Rivera or any other defendant threatened the plaintiff for filing grievances.  Instead, it describes the plaintiff's version of events concerning the cell extraction and subsequent imposition of in-cell restraints. *Id.* at 85-86.  Thus, neither this grievance nor any of the others alerted prison officials that the plaintiff was complaining that Rivera or any other defendant had taken some action against him – or was threatening to do so – because he had previously filed a grievance or engaged in other

First Amendment-protected activity or because he was contemplating doing so.[6]  Accordingly,

the plaintiff has failed to exhaust his First Amendment retaliation claim.

Exhaustion is not a barrier, however, to the plaintiff's pursuit of the remaining claims.

The Supreme Court considers administrative remedies unavailable if correctional officials are

"unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross,* 136 S. Ct. at

1859.  In addition, the Second Circuit recently held that an inmate who follows a prison's

grievance procedure in its entirety exhausts his remedies under the PLRA when prison officials

fail to respond in accordance with mandatory deadlines imposed by that procedure. *Hayes v. T.*

*Dahlke,* -- F.3d --, 2020 WL 5883945 *7 (2d Cir. Oct. 5, 2020).  And *Dahlke* cited favorably

more broadly stated holdings by other Courts of Appeal that a prisoner's administrative remedies

are deemed exhausted – or the administrative remedies are considered unavailable under *Ross* –

whenever prison officials fail to respond to a properly submitted grievance or administrative

---

[6] In his affidavit, the plaintiff avers that after he filed grievances on January 6, 2019, Rivera threatened on January 15, 2019 to "chain him up" if he kept filing grievances.  (ECF No. 50-3 at 6.)  He submits no evidence that he filed a grievance related to this event.  In addition, this single, conclusory reference would be insufficient to create a genuine dispute of material fact as to the retaliation claim, because it is insufficient to satisfy the adverse action requirement for a retaliation claim.  Not every unnecessary statement of a prison guard regarding an inmate's exercise of First Amendment rights constitutes adverse action. *See, .e.g, Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001)("Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation."); *Dorsey v. Fisher*, 468 F. App'x 25, 27 (2d Cir. 2012) (affirming dismissal of retaliation where alleged statements did "not include any allegations of physical harm, nor [were] they alleged with any specificity"); *Mateo v. Fischer*, 682 F. Supp. 2d 423, 432-33, 434 (S.D.N.Y. 2010) (finding no adverse action where correctional officer twice threatened inmate with physical violence for writing grievances, including one incident where the officer entered inmate's cell, held his gloved fist to the inmate's face, and said that one day he and the inmate would party); *Barrington v. New York,* 806 F. Supp. 2d 730, 746 (S.D.N.Y. 2011) (statement that officer would "get" prisoner for filing grievance insufficient to support retaliation claim); *Bumpus*, 495 F. Supp. 2d at 326-27 (statements that defendant chastised prisoner for filing grievances and said he was tired of prisoner "'writing his officers up'" lack specificity or "concrete harm" required to support retaliation claim); *Bartlley v. Collins*, No. 95 Civ. 10161(RJH), 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) (holding that verbal threat "we going to get you, you better drop the suit" does not constitute adverse action); *Alicea v. Howell*, 387 F. Supp. 2d 227, 237 (W.D.N.Y. 2005) (statements to prisoner that there were "no secrets in prison" and that prisoner would "have to pay the consequences for filing a grievance against [defendant]" insufficient to support retaliation claim).  Thus, even if the plaintiff had exhausted his retaliation claim, I would find that that claim failed on the merits on this record.

appeal within the time limits prescribed by the prison's policies.  *See id.* citing, among others, *Shifflett*, 934 F.3d at 365.  The plaintiff has provided copies of six level 1 grievances he filed and states that he did not receive a response to any grievance.  As noted, under the applicable rules, prison officials were required to respond to the plaintiff's grievances within 30 days. Administrative Directive 9.6(6)(I).   The defendants concede that they received four of the grievances but provide no responses and note there is no record of any responses being issued. As to the remaining two grievances, the plaintiff has at least raised a genuine dispute of material fact about whether he filed them.  Accordingly, the defendant's motion for summary judgment is denied on exhaustion grounds, except as to the retaliation claim.

      B.      <u>Denial of Due Process</u>

      The plaintiff does not challenge his original placement on Chronic Discipline status. Instead, he argues that he had completed the Chronic Discipline Program before he was sent to Massachusetts in November 2018.  The Department of Correction Administrative Directives provide that only the Director of Offender Classification and Population Management or someone of higher authority can remove an inmate from Chronic Discipline status and that the removal is done by written decision.  Directive 9.4(11)(H), Defs.' Mem. Ex. W, ECF No. 21. The plaintiff submits no evidence showing that he was removed from Chronic Discipline status and has not named any defendant who could have removed him from that status.  Rather, as noted above, he submitted an email chain showing that he remained in phase 2 of Chronic Discipline status when he was moved to HCC in late November 2018.  Thus, there is no factual basis for his claim that he was improperly considered to be on Chronic Discipline status.

      The plaintiff asserts two due process claims.  *See* Ruling on Defendants' Motion to

Dismiss, ECF No. 34 at 10.  First, he contends that defendants Rivera, Black, and Green denied him due process by failing to hold a hearing before returning him to Chronic Discipline status or placing him in a restrictive housing unit on his first return to Connecticut.  ECF No. 1 ¶¶ 23-24. Second, he claims they placed him on Administrative Detention status on his second return to Connecticut because he was on "out of state status," which the plaintiff believes is an improper reason for placement.  *Id.*, second ¶ 72.

In *Wilkinson v. Austin*, 545 U.S. 209 (2005), the Supreme Court considered the process due inmates in connection with their classification and transfer to Ohio's highest security prison. Before any particular process is required, an inmate must demonstrate that he has a protected liberty interest in avoiding the classification at issue.  *Id.* at 221 (before invoking procedural protections of the Due Process Clause, inmate must establish deprivation of an interest in life, liberty, or property).  The United States Constitution does not create a liberty interest in avoiding transfer to more adverse conditions of confinement.  *Id.* (citing *Meachum v. Fano*, 427 U.S. 215, 225 (1976)).

A liberty interest may arise under state regulations, but only if the restraint imposed "while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Id.,* at 222-23 (quoting *Sandin*, 515 U.S. at 483–84 (internal quotation marks omitted)).  Thus, the Court must consider the nature of the restrictions the plaintiff faced in restrictive housing under each placement and the severity of those conditions in relation to the ordinary incidents of prison life, not any specific procedural requirements in the prison directives.  *Id.* at 223 (citing *Sandin v. Conner*, 515 U.S.

22

472, 484 (1995)).

The Second Circuit has held that the *Sandin* analysis should be applied to determine whether placement in  administrative or punitive segregation implicates a liberty interest.  *Arce v. Walker*, 139 F.3d 329, 334-35 (2d Cir. 1998).  To determine whether conditions of segregated confinement constitute an atypical and significant hardship, the district court should consider the duration of the inmate's confinement in segregation as well as the conditions of segregated confinement.  *Palmer v. Richard*, 364 F.3d 60, 64 (2d Cir. 2004); *see also Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) ("[T]he duration of [segregated] confinement is a distinct factor bearing on atypicality and must be carefully considered.").

The plaintiff's first placement was eighteen days, from November 30, 2018 until December 18, 2018.  The second was for nineteen days, from January 3, 2019 until January 22, 2019.  During all of the second placement and all but four days of the first placement, the plaintiff was subjected to limited out-of-cell time, showers, spending, and visits.  For four days of the first placement, however, the plaintiff alleged that he was placed in a cell where he was exposed to freezing weather through a crack in the cell wall, the toilet did not flush, there was no hot water in the sink, and the light was left on 24/7.  ECF No. 1 ¶ 61.  The Initial Review Order in this case noted that confinement under harsh conditions for a short time can be atypical, *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004), and permitted the claim to proceed.[7]

1.   December 2018 Placement

The plaintiff was confined in both South Block and RHU in December 2018.  For all

---

[7] In the Initial Review Order, the Court construed the due process claim to apply only to the first placement. The Court later granted the plaintiff's motion for reconsideration and considered the due process claim to encompass both placements.  *See* ECF No. 33.

except four days, he was confined under typical restrictive housing conditions.  For four days, however, the plaintiff avers that he was placed in a cell where he was exposed to freezing weather through a crack in the cell wall, the toilet did not flush, there was no hot water in the sink, and the light was left on 24/7.[8]  ECF No. 50-3 at 5.  The Second Circuit has held that confinement under harsh conditions, even for a short time, can be atypical.  *Palmer*, 364 F.3d at 64.

Neither party has presented any objective evidence regarding the conditions in RHU cell 11.  Although the defendants state that the conditions of the cell are seen on the video footage, the video only shows the plaintiff entering cell 11 after he is downgraded from in-cell restraints.  The entire cell is not visible.  Thus, the Court cannot determine whether confinement in cell 11 for four days made the plaintiff's first placement an atypical and significant hardship.

The defendants also contend that, even if the plaintiff had a protected liberty interest, a hearing was not required, because the plaintiff remained on Chronic Discipline status.  The defendants state that the plaintiff was on Chronic Discipline status on November 8, 2018, when he was transferred to Massachusetts, and remained on that status when he returned to Connecticut on November 30, 2018, twenty-two days later.  As set forth above, I agree with the defendants on this issue.

The plaintiff appears to be making an argument analogous to that made in *Allah v. Milling*, 876 F.3d 48 (2d Cir. 2017), where a pretrial detainee was placed in Administrative Segregation upon admission to custody without a hearing because he had been classified to Administrative Segregation before his discharge and had not completed the Administrative

---

[8] Contrary to defendants' assertions, the plaintiff did exhaust this specific claim.  See ECF No. 50-3 at 90.

Segregation Program.  *Id.* at 52.  The analogy is inappropriate.  First, the plaintiff is not a pretrial

detainee.  Second, contrary to the plaintiff's assertions, he was never discharged from

Connecticut custody; he was merely transferred to Massachusetts under an interstate corrections

compact, which is similar to a transfer to a different Connecticut correctional facility.  An

interstate corrections compact is a contract between the sending state and the receiving state.

The receiving state acts as the agent for the sending state with the inmate at all times remaining a

prisoner of the sending state and under the sending state's jurisdiction.  *See Barnes v. Florida*

*Parole Comm'n*, No. 3:04-CV-775(SRU), 2004 WL 1553610, at *2 (D. Conn. July 9, 2004)

(citing *Smart v. Goord*, 21 F. Supp. 2d 309, 313 (S.D.N.Y. 1998)).

　　　As the plaintiff remained a Connecticut prisoner and continued to have an active Chronic

Discipline classification, which was confirmed by IMU each time he returned to Connecticut, the

plaintiff was not entitled to a hearing merely because he returned to Connecticut.  Thus, even if I

assume, without deciding, that the four days the plaintiff spent in unusually harsh conditions in

cell 11 – which was a restricted housing cell – constituted "an atypical and significant hardship"

under *Palmer*, the plaintiff received all the process he was due for such a placement when he was

first placed on chronic discipline status – a status that remained in effect when he was placed in

cell 11.  As noted, the plaintiff does not challenge the adequacy of the process he received when

he was placed on chronic discipline status; he argues only – and, as shown, incorrectly – that he

was no longer on that status when he arrived at HCC in late November 2018.[9]  The defendants'

---

[9] The plaintiff has not made an Eighth Amendment conditions of confinement claim with respect to the four days he spent in Cell 11.  Even if he had, however, such a claim would be unlikely to succeed given the short duration of the confinement.  *See, e.g., Trammell v. Keane*, 338 F.3d 155, 159 (2d Cir. 2003)(no Eighth Amendment violation in case involving deprivation of mattress and bedding for fourteen days, deprivation of clothing and toiletries for seventeen days, inadequate supply of toilet paper for a week, and exposure to "bitter cold" without adequate clothing, where inmate offered no evidence that temperature in cell posed threat to health or safety).

motion for summary judgment is granted, and the plaintiff's motion for summary judgment is denied, on the due process claim regarding the December 2018 placement.

2.   January 2019 Placement

Unlike his return in December 2018, in January 2019, the plaintiff was placed on Administrative Detention status.  He challenges the lack of a hearing before his placement on Administrative Detention for nineteen days.  The plaintiff was housed in three cells in South Block during this placement.  The plaintiff does not dispute that all RHU and South Block cells are heated, and the heating system was operating normally from November 2018 through January 2019, although he disagrees that the temperatures were comfortable.  The plaintiff also conceded that he was provided bed linens and, in cells were the lights were centrally controlled, the lights remained on only from 8:00 a.m. until 11:00 p.m.  On Administrative Detention status, the plaintiff had restricted out-of-cell time, limited spending in the commissary and showers, restricted visits, no participation in facility programs, meals in his cell, and additional security checks and cell searches.

In *Sandin*, the Supreme Court held that confinement for thirty days in disciplinary segregation did not present the type of atypical and significant deprivation that implicated a liberty interest.  515 U.S. at 485-86.  Absent evidence of more onerous conditions, the Second Circuit has held that segregated confinement of less than the thirty days referenced in *Sandin*, does not implicate a protected liberty interest.  *See, e.g., Smith v. Arnone*, 700 F. App'x 55, 56 (2d Cir. 2017) (summary order) (noting lack of evidence that conditions of punitive segregation "were more onerous than usual restrictive confinement" in finding that 30-day sanction did not implicate a liberty interest); *Palmer v. Richards*, 364 F.3d 60, 66 (2d Cir. 2004) (noting that the

26

Second Circuit has affirmed dismissal of due process claims where period of confinement was shorter than 30 days and there is no evidence of unusually restrictive conditions); *Sealey v. Giltner*, 197 F.3d 578, 589 (2d Cir. 1999) (finding that 101-day confinement in special housing unit, while "doubtless unpleasant," is "not an atypical and significant hardship") (internal quotation marks and citation omitted).

As the plaintiff presents no evidence of unusually harsh conditions in South Block in January 2019, his due process claim relating to this placement fails for lack of evidence of a liberty interest. The defendants' motion for summary judgment is granted, and the plaintiff's motion for summary judgment is denied, on the due process claim relating to the January 2019 placement.

  C. <u>Excessive Force and Failure to Intervene</u>

The plaintiff's excessive force claims relate to the use of the chemical agent, the cell extraction, and application of in- cell restraints. He contends that Officer Rivera used excessive force and defendant Harris failed to intervene to prevent the use of force.

To prevail on a claim for use of excessive force in violation of the Eighth Amendment, the plaintiff must present evidence establishing objective and subjective components. *See Sims v. Artuz*, 230 F.3d 14, 20-21 (2d Cir. 2000). The objective component focuses on the harm done to the prisoner in light of contemporary standards of decency. The amount of harm required depends on the nature of the claim. *Id.* at 21. Although some degree of injury is usually required, the prisoner need not show that he suffered a significant injury to state a claim for use of excessive force. *See Wilkins v. Gaddy*, 559 U.S. 34, 34 (2010) ("[T]he use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the

inmate does not suffer serious injury.") (quoting *Hudson v. McMillian*, 503 U.S. 1, 4 (1992)). However, "not 'every malevolent touch by a prison guard gives rise to a federal cause of action.'" *Id.* at 37 (quoting *Hudson*, 503 U.S. at 9).  The subjective component of the excessive force standard requires a showing that the use of force was "carried out 'maliciously and sadistically' rather than as part of 'a good faith effort to maintain or restore discipline.'" *Id.* at 40 (quoting *Hudson*, 503 U.S. at 9).  The inmate-plaintiff bears the burden of establishing both components.  *See Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993).

The extent of the inmate's injuries is one factor the court may use to determine whether correctional staff could "plausibly" have considered the force necessary in a particular situation. *Hudson*, 503 U.S. at 7.  Other factors include "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Id.* (internal quotation marks and citation omitted).

      1.    <u>Chemical Agent</u>

The Supreme Court has held that prison officials should be afforded "a wide range of deference" concerning their efforts "to preserve internal order and discipline and to maintain institutional security." *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986).  Courts within this district have held that use of a chemical agent is an acceptable means of gaining control of a disruptive inmate.  *See, e.g., Gulley v. Hall*, No. 3:15cv962(MPS), 2017 WL 1078630, at *6-7 (D. Conn. Mar. 21, 2017) (use of chemical agent against inmate who covered cell window and refused orders to remove covering and leave cell did not constitute excessive force); *Carolina v. Pafumi*, No. 3:12-cv-163(VLB), 2013 WL 1673108, at *8-10 (D. Conn. Apr. 17, 2013) (use of

chemical agent to subdue noncompliant inmate did not constitute excessive force); *Alston v. Butkiewicus*, No. 3:09-cv-207(CSH), 2012 WL 6093887, at *13-15 (D. Conn. Dec. 7, 2012) (use of chemical agent did not constitute excessive force when inmate refused to comply with direct orders).

The use of the chemical agent was captured on videotape and a copy was submitted as evidence in support of the defendants' motion for summary judgment. Courts within this circuit have relied on videotape evidence to grant motions for summary judgment in cases involving claims of use of excessive force including use of chemical agents. *See Carolina*, 2013 WL 1673108, at *3 (citing *Flemming v. Kemp*, No. 09-CV-1185(TJM/DRH), 2012 WL 4094196, at *11-12 (N.D.N.Y. Aug. 30, 2012) (citing cases), *report and recommendation adopted*, 2012 WL4094009 (N.D.N.Y. Sept. 17, 2012)).

The video footage shows that, after throwing a liquid at defendant Rivera, the plaintiff blocked the cell door and window with his mattress and refused repeated orders to remove the obstruction and exit the cell.[10] The plaintiff refused to comply. Defendant Rivera issued several warnings that a chemical agent would be used if the plaintiff did not comply with the order. Defendant Rivera also had defendant Harris as well as mental health and medical staff speak

---

[10] The plaintiff contends that there were six uses force, not just the three described by the defendants. The plaintiff contends that defendant Rivera kicked his hand immediately after he threw the liquid. The video footage from the stationary camera does not support this. The plaintiff also states that defendant Rivera sprayed him with the chemical agent twice through the crack of the door. As noted above, however, that claim is not in the case, because it is not mentioned in the specific litany of events described in the complaint. Further, although the footage from the stationary camera shows defendant Rivera's hand near the crack in the door immediately after the plaintiff threw the liquid at him, Defs.' Mem. Ex. K, ECF No. 47, at 4:10, the footage does not clearly show what defendant Rivera had in his hand. However, no correctional officers reacted as they did after deployment of the chemical agent with the BOT; several were observed and heard to be coughing after those deployments. In any event, as discussed below, there is no evidence the plaintiff suffered any injury from the chemical agent – even from the three deployments both parties acknowledge occurred.

with the plaintiff to obtain compliance.  The plaintiff refused.  When the plaintiff stated that use

of a chemical agent was contraindicated because he has asthma, defendant Rivera asked CHN

Tralli to check the plaintiff's medical records.  CHN Tralli reported there were no

contraindications.  The chemical agent was deployed through the trap using the BOT to aid in

moving the mattress.  After each deployment, the plaintiff was given an opportunity to comply

with the order.  Once the plaintiff indicated his willingness to comply, no further force was used.

He was escorted to the shower where he declined decontamination.

The plaintiff contends that defendant Rivera deployed the chemical agent unnecessarily

as he stated repeatedly that he would leave the cell if the warden or captain were present.  There

are no reported cased in the Second Circuit finding a constitutional right to have a high-ranking

prison official present before an inmate consents to leave his cell and the plaintiff does not

identify any such authority.  In an analogous case, another district court in this circuit found no

clearly established right to have a supervisor present during a cell search.  *See Dukes v. Schuck*,

No. 09-CV-6312-FPG, 2013 WL 12181002, at *8 (W.D.N.Y. Sept. 17, 2013).  Other district

courts have found no right to have a supervisor present.  *See Bailey v. Hughes*, 815 F. Supp. 2d

1246, 1270 (M.D. Ala. 2011) (inmate refused to leave cell stating he feared for his life; "[The

plaintiff's] mere insistence, both on the night in question and in his complaint, that he was

entitled to have a supervisor present during all of his interactions with correctional officers does

not grant him such a right.  As Defendants point out, if inmates had a right to have every

interaction with prison personnel directly monitored by a supervisor, the efficient operation of

correctional facilities would be greatly hindered."); *see also Burns v. Morgan*, No.

1:14CV172SNLJ, 2017 WL 1477125, at *2 (E.D. Mo. Apr. 24, 2017) ("Although plaintiff

30

argues that the defendants should have had a supervisor present before removing him from his

cell, that argument does not support that plaintiff's constitutional rights were violated.").

Although the plaintiff states that he suffered lasting effects of the chemical agent, he

presents no evidence to support his statement.  On the video footage he displays no effects.

Indeed, once he emerges from the cell, he appears to be the only individual in the vicinity who is

not coughing at all due to the chemical agent.  After he was brought to the shower, he declined

decontamination stating, "I'm good."  He did not state, as he now argues, that decontamination

would be ineffective while wearing the spit veil, and he did not ask that the spit veil be removed

for decontamination.  The plaintiff made no complaints and did not request medical attention

when medical staff checked placement of the in-cell restraints.  The nurse observed no signs or

symptoms of distress from the chemical agent.  *See* Defs.' Mem. Ex. J, ECF No. 46 at 32.  The

plaintiff provides no copies of requests for medical treatment for the effects of the chemical

agent.  Nor did he complain of any effects of the chemical agent or request medical attention

when he was released from in-cell restraints the following day.  *See* Defs.' Mem. Ex. M, ECF

No. 49.  In light of the record evidence, the defendants' motion for summary judgment is

granted, and the plaintiff's motion for summary judgment is denied, on the excessive force claim

for use of the chemical agent by defendant Rivera.[11]  Further, as the plaintiff's excessive force

---

[11] Because there is no evidence of even a slight injury, I would reach the same result even if I found that plaintiff's new claim that Rivera sprayed the chemical agent through the side of the door right after the plaintiff threw liquid at him could properly be considered as part of the complaint. "[N]ot … every malevolent touch by a prison guard gives rise to a federal cause of action.  The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (internal citation and quotation marks omitted).  A short burst of chemical agent into a cell immediately following an assault by an inmate – if that is what occurred here -- and causing no discernible injury is not force "of a sort repugnant to the conscience of mankind." *See also Boddie v. Schnieder*, 105 F.3d 856, 862 (2d Cir. 1997)(excessive force claim based on bumping, grabbing, elbowing and pushing failed to state Eighth Amendment violation where inmate alleged no pain or injury); *Flemming v. Kemp*, 2012 WL 4094196 *13 (N.D.N.Y. Aug. 30, 2012)(granting

31

claim fails, there is no basis for his claim that defendant Harris failed to intervene to prevent the use of excessive force.  The defendants' motion is granted, and the plaintiff's motion is denied, as to the failure to intervene claim against defendant Harris.

> 2.   Cell Extraction

Other than the use of the chemical agent, the only thing the plaintiff objects to relating to the cell extraction is the use of the spit veil.  Although the plaintiff argues that application of the spit veil was not warranted under the directives, there are no reported cases in this circuit finding a constitutional right preventing its use or holding the use of a spit veil constitutes excessive force.

The Ninth Circuit considered a claim of excessive force relating to use of a spit mask on an inmate.  In that case, the mask was applied to prevent transmission of bodily fluids.  Although the inmate had difficulty breathing with the mask on, the court found that the lack of evidence that the difficulty breathing affected the inmate's ability to function, caused him pain, or had any effect on his health once removed indicated that no reasonable jury could have concluded that the mask was applied maliciously and sadistically to cause harm as required to state an excessive force claim.  *Allen v. Rivera*, 626 F. App'x 710, 712-13 (9th Cir. 2015).

The plaintiff argues that use of the spit veil was not warranted.  The defendants state that, in light of the plaintiff's actions in throwing the liquid, defendant Rivera feared further assaultive behavior and ordered the spit veil.  I conclude that, at the very least, reasonable officers could disagree about whether it was necessary to place a spit veil on an inmate who had been

---

summary judgment on excessive force claim alleging use of chemical agent in part because "the use of such chemicals did not cause any harm or pain to [the inmate], as noted by his statements, vitals, and subsequent medical records.").

recalcitrant in resisting orders to cooperate in the move to another cell and who had thrown liquid at a correctional officer when first appearing to cooperate.  Unlike the later placement in in-cell restraints, which is discussed below, the imposition of the spit veil took place immediately after the cell door was opened and thus shortly after the plaintiff's repeated refusals to comply and not long after his throwing of liquid at Rivera; it was not unreasonable to take precautions against any and all means of assault at that uncertain juncture.  The Defendants are therefore entitled to qualified immunity on this claim.  *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007)("Even if the right at issue was clearly established in certain respects, however, an officer is still entitled to qualified immunity if officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context." (internal quotation marks omitted)).   In any event, the video footage shows that the veil did not interfere with the plaintiff's breathing, cause him pain, or have any lasting effects.  Thus, even if I had found the spit veil plainly unnecessary, the evidence concerning its imposition would still not create a triable issue of fact concerning the claim for use of excessive force.  The defendants' motion for summary judgment is granted, and the plaintiff's motion for summary judgment is denied, on this claim.

   3.   In-cell Restraints

Finally, the plaintiff challenges his placement on in-cell restraints.  He alleges that defendant Rivera ordered the tether chain to be wrapped in a way that prevented him from standing erect and applied the restraints too tightly.  He also claims that defendant Harris would not permit medical staff to check the restraints and ordered records of his placement falsified to prolong his time on in-cell restraints.

When considering a claim for use of restraints, "the court must consider the individual circumstances surrounding the use of restraints, including the length of time restraints were imposed and the objective sought to be served." *Davis v. Rinaldi*, No. 3:19-CV-504(CSH), 2019 WL 7879729, at \*10 (D. Conn. Oct. 31, 2019) (citation and quotation marks omitted). Maintaining prison order and security is a legitimate penological objective. Thus, using restraints to achieve that objective, without more, is not a constitutional violation. *Shehan v. Erfe*, No. 3:15-cv-1315(MPS), 2017 WL 53691, at \*9 (Jan. 4, 2017); *see Wells v. Stafford*, No. 3:13-cv-1349(RNC), 2015 WL 1471597, at \*3 (D. Conn. Mar. 31, 2015) (whether use of restraints can be considered use of excessive force depends on the reason restraints were applied).

Directive 6.5, entitled "Use of Force," provides that correctional staff may use force to maintain discipline, order, and security, but that the amount of force uses "shall be reasonable and appropriate to the circumstances based on the situation, the information in the possession of correctional personnel at the time, and the information reasonably available under the circumstances." Directive 6.5(4)(b), Def's Mem. Ex. V, ECF No. 45-20. Staff are authorized to "immediately use force and/or apply restraints when an inmate's behavior constitutes an immediate threat to self, others, property, order or the safety and security of the facility." Directive 6.5(4)(d). However, "[p]hysical force shall not be used for the harassment or punishment of any person." Directive 6.5(4)(f).

The plaintiff had just thrown liquid at Defendant Rivera and refused multiple orders to remove the obstruction to the cell door and exit the cell, only doing so after a chemical agent was deployed. Defendant Rivera states that he feared further disruptive behavior and ordered that

34

restraints be applied as part of his efforts to maintain order.  The plaintiff argues that at all times after he left the cell he complied with all orders and was not disruptive.  The entire cell extraction through placement on in-cell restraints was recorded.  The video footage shows that from the time he finally removed the mattress and put his hands through the trap for handcuffing up through the time he was moved to a different cell and placed in in-cell restraints – a span of about 23 minutes – the plaintiff was calm and complied with all orders.  He did or said nothing indicating that he continued to pose a threat to prison safety and security.  Thus, the plaintiff argues that use of in-cell restraints was not warranted.

I conclude that there is a triable issue of fact regarding whether there was a legitimate safety or security basis for defendant Rivera's placement of the plaintiff in in-cell restraints or whether the placement was done to punish the plaintiff for his earlier conduct.  Given the length of time that passed between the plaintiff's refusals to obey orders and throwing of liquid, on the one hand, and the completion of the application of in-cell restraints, on the other, which included a full 23 minutes in which the plaintiff was calm and compliant while in the company of correctional staff, a reasonable juror could find that the application of the restraints was done "maliciously and sadistically for the very purpose of causing harm" – and, specifically, to punish the plaintiff for his earlier misconduct – rather than "in a good-faith effort to maintain or restore discipline." *Hudson*, 503 U.S. at 6.  And because there is a genuine dispute of material fact on this point, I cannot grant summary judgment on qualified immunity grounds.  *See Johnson v. Testman*, 380 F.3d 691, 698 n.6 (2d Cir. 2004)(adopting district court's conclusion that, if defendant's "intent in handcuffing [the plaintiff] behind his back to his cell for no apparent reason for seven hours was in fact for the sole reason to inflict wanton, gratuitous, cruel pain on

him," "there would be a clearly established right under the Eighth Amendment not to be subjected to that sort of cruel and inhumane punishment that would deprive the defendant on those facts of qualified immunity.").

Both motions for summary judgment are denied on the excessive force claim against defendant Rivera for placement in in-cell restraints.  *See Wells*, 2015 WL 1471597, at *3 (denying summary judgment where correctional staff claimed inmate was disruptive and inmate submitted affidavit saying he was not).

Defendant Harris was not present when defendant Rivera ordered placement on in-cell restraints or during the application of the restraints.  She was present only during one medical check on the evening of December 7, 2018 and decided, based on notations made by officers checking on the plaintiff, that the restraints should not be removed at that time.  The plaintiff alleges that defendant Harris would not permit medical staff to check the restraints and ordered notations on the restraint check list falsified to prolong his time on in-cell restraints.  He provides no evidence to support these allegations and has no personal knowledge of events occurring outside his cell to support the statements in his affidavit.  Defendant Harris has submitted a declaration stating that she was involved in reviewing the plaintiff's placement only once, at 6:10 p.m. on December 7, 2018, and made her decision at that time based on the notations on the restraint check list.  The plaintiff's contemporaneous medical record indicates that he was "verbally aggressive" during the same medical check Harris attended.  ECF No. 46 at 28.  The plaintiff fails to present any admissible evidence creating an issue of fact regarding the subjective component of the excessive force test.

36

Further, the plaintiff's claim that the restraints were too tight fails on this record.  "There is consensus among courts in this circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort."  *Lozada v. City of New York*, No. 12 Civ. 0038(ILG)(JMA), 2013 WL 3934998, at *5 (S.D.N.Y. July 29, 2013) (quoting *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008) (collecting cases)) (internal quotation marks omitted).  When the restraints were removed, the medical check showed only minor abrasions, and the plaintiff presents no evidence of an injury from the application of the restraints.  The defendants' motion for summary judgment is granted, and the plaintiff's motion for summary judgment is denied, on the excessive force claim against defendant Harris regarding in-cell restraint placement.

D.     <u>Deliberate Indifference to Medical Needs</u>

The plaintiff contends that defendants Rivera and Harris were deliberately indifferent to his medical needs when defendant Rivera deployed a chemical agent without consulting the medical unit after the plaintiff told him that he had asthma and use of a chemical agent was contraindicated in his medical records and defendant Harris failed to intervene and prevent the use.  He also argues that defendants Black and Green are liable for this conduct under a theory of supervisory liability because they took no action when he informed them the following day about the use of the chemical agent.

Both the Supreme Court and the Second Circuit have held that prison officials' deliberate indifference to serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment.  *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).  To state a claim for deliberate indifference to a serious

medical need, the plaintiff must show that the prison official knew that he faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it. *Harrison v. Barkley*, 219 F.3d 132, 137-38 (2d Cir. 1998) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

There are objective and subjective components to the deliberate indifference test.  Under the objective prong, the plaintiff's medical need must be "a serious one."  *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003).  Subjectively, the defendant's conduct must constitute recklessness; he must act or fail to act while "actually aware of a substantial risk that serious inmate harm will result."  *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006); *see also Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (requiring the defendants to have been "subjectively reckless").  Negligence that would support a claim for medical malpractice does not rise to the level of deliberate indifference and is not cognizable under section 1983.  *See Salahuddin*, 467 F.3d at 280.

The residual effects of a chemical agent generally do not constitute a serious medical need.  *See Alston v. Butkiewicus*, No. 3:09-cv-207(CSH), 2012 WL 093887, at *16 (D. Conn. Dec. 7, 2012) (citing cases).  On initial review, the Court noted that the plaintiff generally alleged that the suffered effects from the chemical agent but did not allege that he suffered an asthma attack or requested medical attention.  The Court permitted the claim to proceed to enable the plaintiff to develop the record on this claim.  ECF No. 10 at 16-17.

On initial review, the complaint is construed in the light most favorable to the plaintiff. At the summary judgment stage, the plaintiff must present evidence to support his allegations. Evidence submitted in support of the motion for summary judgment shows that the favorable

inference was not warranted.  Other than a conclusory assertion in his affidavit, the plaintiff presents no evidence that he suffered any ill effects from the chemical agent deployed on December 7, 2018, and, as discussed above, the video footage of the incident shows no effects from the chemical agent.  While several officers can be heard coughing, the plaintiff does not cough or display any ill effects.  Further, the plaintiff declined decontamination and did not seek treatment for the effects of the chemical agent when checked by medical staff for placement on in-cell restraints.  The only medical evidence the plaintiff presents is a medical incident report in which the plaintiff is quoted as stating that he experienced a reaction to a chemical agent about eight months before the December 7, 2018 incident.  Especially in light of the video evidence, this is insufficient to show that the plaintiff had a serious medical need on December 7, 2018.  No reasonable juror could find otherwise on this record.

In addition, the video footage shows that, after the plaintiff stated that use of a chemical agent was contraindicated in his medical records because he has asthma, defendant Rivera asked CHN Tralli to check the plaintiff's medical records.  CHN Tralli left the tier.  When he returned, he told defendant Rivera that there were no contraindications in the medical records.  As a custody officer, defendant Rivera was entitled to rely on information from medical staff.  *See, e.g., Benitez v. Parmer*, No. 9:12-CV-0448(GTYS/DEP), 2013 WL 5310245, at *6 (N.D.N.Y. July 8, 2013) ("It is well established that supervisory prison officials are entitled to rely on the opinions of medical professionals concerning the proper course of treatment."); *McNamara v. Lantz*, No. 3:06-CV-93(PCD), 2008 WL 11391317, at *2 (D. Conn. Jan. 31, 2008) (same).  Even if the information Tralli provided was inaccurate, Defendant Rivera's reliance on it forecloses the plaintiff's ability to satisfy the subjective component of his deliberate indifference claim.

The plaintiff has not submitted evidence raising a genuine dispute of material fact about whether defendant Rivera acted while aware of a substantial risk that the plaintiff would suffer serious harm as a result of his actions.  The defendants' motion for summary judgment is granted, and the plaintiff's motion is denied, on the deliberate indifference claim against defendants Rivera and Harris.

Further, as the Court has granted summary judgment on the claim for deliberate indifference to medical needs, there is no basis for a supervisory liability claim.  *See Lawrence v. Evans*, 669 F. App'x 27, 28 (2d Cir. 2016); *Raspardo v. Carlone*, 770 F.3d 97, 127 (2d Cir. 2014) ("Liability cannot be imputed to [the supervisor] without an underlying constitutional violation.").  The defendants' motion for summary judgment is granted, and the plaintiff's motion is denied, on the supervisory liability claim against defendants Black and Green.

IV.   Conclusion

The defendant's motion for summary judgment [**ECF No. 45**] is **GRANTED** at to all claims except the claim for use of excessive force against defendant Rivera regarding placement on in-cell restraints and the plaintiff's motion for summary judgment [**ECF No. 50**] is **DENIED**. The defendants' motion to amend their motion for summary judgment to include a complete exhibit [**ECF No. 65**] and the plaintiff's motion to add exhibit [**ECF No. 58**] are **GRANTED**.

The case will proceed to trial on this one remaining claim.

**SO ORDERED** this 22nd day of October 2020 at Hartford, Connecticut.

_____/s/_____
Michael P. Shea
United States District Judge

40